492 So.2d 1357 (1986)
SOLITRON DEVICES, INC., Appellant,
v.
VEECO INSTRUMENTS, INC., a New York Corporation, Authorized to Do Business in the State of Florida, Appellee.
No. 85-1038.
District Court of Appeal of Florida, Fourth District.
August 6, 1986.
Rehearing Denied September 26, 1986.
Phillip C. Gildan of Nason, Gildan, Yaeger & Gerson, P.A., West Palm Beach, for appellant.
T.M. Barlow of Gleason, Barlow & Dyer, P.A., Indialantic, for appellee.
HERSEY, Chief Judge.
Veeco Instruments, Inc., contracted to sell, deliver and install two sophisticated electronic devices known as ion implanters, one in the California plant and one in the Florida plant of buyer, Solitron Devices, Inc. Litigation arose as to both units. After a lengthy trial, judgment was entered for the seller and against the buyer. That judgment is the subject of this appeal.
The issues drawn by the pleadings differ from those contemplated by the pretrial stipulation and, in turn, those differ in some respects from the issues actually tried. Our consideration will be restricted to issues in the final judgment specifically treated by the parties in their briefs and at oral argument.
The transactions in question resulted from Solitron's decision to convert from an ion implanter which utilized manual cycling of silicon wafers through the end station of the implanter to an implanter that accomplished this step automatically. The function of the implanter, as its name implies, is to imbed ions of certain minerals into the silicon chips which Solitron produces for *1358 the computer industry and related industries. The implanters were intended by Solitron to be used to process a very thin silicon wafer described as a two-inch, six-millimeter wafer, as opposed to standard wafers, which are fifteen to twenty-five millimeters thick. It is undisputed that Veeco was aware of Solitron's intended use for the machines.

I. California Implanter
The first implanter was delivered to Solitron's California plant and after approximately ten weeks of assembly and testing was put into operation. The results were unsatisfactory to Solitron because of a five percent rate of breakage of the thin chips. Solitron considered breakage exceeding one-half percent to be unacceptable. As to this unit Solitron sought damages for breach of the warranties of merchantability, fitness for a particular purpose, and conformity to model, having paid the full purchase price of $242,000. With the exception of breach of the express warranty of fitness for a particular purpose, contained in the sales contract, we conclude that Solitron's claims are without merit.
The warranty clause contained in the agreement provides:
Warranty. Seller warrants that all material, goods, and services furnished to Buyer hereunder will conform to applicable specifications, drawings, samples, and/or other descriptions given, shall be free from defects in workmanship and material, shall be merchantable, and if selected or specified for Buyer's purposes shall be fit for such purposes.

(Emphasis added.)
We interpret this paragraph as warranting that the ion implanter would be fit for the purpose of processing the thin wafers, since Veeco was aware that such was its intended use. We concur in the trial court's conclusion that Veeco did not represent to Solitron that only a specified percentage of breakage would occur. However, this does not carry the day, because Veeco's warranty of fitness for Solitron's purpose necessarily includes a representation that the breakage would be within reasonable limits. The question then becomes not whether Veeco represented to Solitron a specified percentage of breakage, but whether there is substantial competent evidence to support a finding that the five percent breakage rate was within reasonable limits, or whether this rate of breakage rendered the implanter unfit for the purpose of processing Solitron's thin wafers.
Considerable evidence was presented indicating that the five percent breakage rate far exceeded acceptable levels, and that this machine was not in fact fit for Solitron's intended purpose. Experts testified that Veeco's automatic implanter is not appropriate for use in processing thin wafers because it breaks them by applying an inordinate amount of stress. Veeco's own vice-president of engineering testified that this implanter should not be sold for the processing of six-millimeter wafers. Although the experts for both parties agreed that there is no specific industry consensus on acceptable breakage percentages, we note that Solitron's expert testified that concern over excess breakage comes into play when the breakage exceeds one-half percent, and Veeco's own expert indicated that the breakage rate of the wafers processed at the Solitron plant exceeded reasonable limits. The testimony regarding lack of set industry standards has no effect one way or the other as far as proving that any particular level of breakage is or is not acceptable.
On the other hand, we can find no evidence in the record to support a finding that the Veeco implanter was in fact suitable for Solitron's processing needs or that the five percent breakage level is within acceptable limits.
We note that Veeco argues on appeal that lack of skill on the part of Solitron's operators caused the excessive breakage. While evidence was presented below that the breakage rate would depend to some extent upon the operator's skill, we find no evidence that it was in fact lack of skill which caused Solitron's problems. On the *1359 contrary, in the opinion of Veeco's expert, Solitron's operators were not responsible for any of the breakage.
We therefore hold that the trial court erred in concluding that Veeco did not breach its express warranty of fitness for a particular purpose, as this finding is not supported by substantial competent evidence.

II. Florida Implanter
Veeco shipped its equipment to Solitron's Florida plant in late September 1980, and installation was initially scheduled to begin in November. Commencement of installation was, however, delayed at the request of Solitron until late February 1981. The contract did not specify a time for completion of installation.
Approximately four weeks into the installation process  which had taken ten weeks at the California plant  Solitron advised Veeco that it was terminating assembly by Veeco's personnel and returning the unit. Veeco responded that it would complete installation within a week, that normal installation time was five to six weeks, and that return of the unit would not be authorized. In reply, Solitron referred to a testing period, the normal length of installation, and stated: "We request installation completion in no more than 2 weeks." To this Veeco made no response, and two weeks later Solitron terminated installation because assembly had not, in its opinion, been completed. As to this unit Solitron seeks termination of the contract for failure of Veeco to meet a time limit proposed by Solitron and acquiesced in by Veeco by failure to object to the proposed time of completion. The purchase price has not been paid.
Initially, Solitron gave other reasons for termination of installation of the implanter, but ultimately it relies on failure to timely complete installation as a sufficient basis for its termination of the contract. Specifically, Solitron relies on a provision of the Uniform Commercial Code and an official comment under that section for the right to terminate.
Section 672.309, Florida Statutes (1985), provides:
Absence of specific time provisions; notice of termination. 
(1) The time for shipment or delivery or any other action under a contract if not provided in this chapter or agreed upon shall be a reasonable time.
(2) Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time but unless otherwise agreed may be terminated at any time by either party.
(3) Termination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party and an agreement dispensing with notification is invalid if its operation would be unconscionable.
Solitron sets out in its brief, official comment number 6 to Section 672.309 as follows:
Parties to a contract are not required in giving reasonable notification to fix, at peril of breach, a time which is in fact reasonable in the unforeseeable judgment of a later trier of fact. Effective communication of a proposed time limit calls for a response so that failure to reply will make out acquiescence.

(Emphasis added.) But we note that the comment further states:
Only when a party insists on undue delay or on rejection of the other party's reasonable proposal is there a question of flat breach under the present section.
(Emphasis added.)
First, the "official comment" is only that: a comment. It has not been adopted as the law of Florida and is at best persuasive only. Regardless, there are countervailing factors which the trial court obviously considered, or may reasonably have considered, in concluding that Solitron breached the contract rather than Veeco.
Second, the language used by Solitron in its communication on this subject, that "we request installation completion in no more than 2 weeks," could reasonably be interpreted *1360 (and thus the trial court could have considered it) as simply a request and not an ultimatum, particularly where the only reference to termination in that communication pertains to a satisfactory testing period, not completion of installation.
Third, we find it somewhat significant that Solitron itself had occasioned prior delays in the installation in excess of three months. Had this not occurred, the installation would in all likelihood have been completed long before April 1981.
Finally, the uniform commercial code does not exist in a vacuum. Existing and related rules of law and principles of equity continue to be applicable to commercial transactions, as well, it is hoped, as common sense and custom and usage. § 671.103, Fla. Stat. (1985). The acquisition of an ion implanter is not on the same level as ordering an item that is ready for use upon delivery. The evidence shows that it is manufactured at the plant, then disassembled and shipped in approximately twenty-five crates to its destination. It is then completely reassembled by engineers and other specialists who test and evaluate each component, sometimes making substitutions to enable the unit to perform satisfactorily upon completion of reassembly. This is a process which took ten weeks at the California installation. It is unreasonable to suggest that midway through the reassembly process the purchaser, simply by demanding completion by a date certain which may, on its face, be impossible of achievement, can unilaterally change the contract to create a default by the seller. The intercession of an opportunity by the seller to respond or to deny, or any other requirement that he communicate an intention to abide by the original terms, including that of a reasonable time for performance, is odious to the policy of good faith which the UCC incorporates into all business dealings.

III. Conclusion
We reverse the trial court's final judgment with regard to the California implanter and remand for entry of judgment in favor of Solitron and for determination of Solitron's damages. As to the Florida implanter, the final judgment is affirmed.
AFFIRMED IN PART; REVERSED IN PART; REMANDED.
DOWNEY and GUNTHER, JJ., concur.